Her next case for argument is Hands v. Bd. of Shawnee Cnty. Good morning. May it please the court, counsel. My name is Jennifer Hill. I'm here on behalf of the plaintiff in this matter, Carolyn Hands. Carolyn is a deaf person who was previously residing in Shawnee County, Kansas. In April of 2015, she made the unfortunate decision to call 911 to help her settle a domestic dispute at her home. Overarching and in consideration in this case, as it was dismissed on summary judgment, is a question of whether or not the ADA is what its intent is. Its intent is to put disabled people on equal footing as able-bodied people. And so I think it's important as we go through the facts of this case and as we consider the arguments, would she have had the same result if she were a hearing person? And I think if we ask that question, every step of the way, the answer is no. And the reason why that matters in this case is because time and again, this chain reaction starts from the moment she calls 911 until the moment she's released from jail. The fact is, if she had been a hearing person, things would have gone differently. The majority of the brief in this case is related to the facts in this case. It's a very factually intensive case. The defendants in their summary judgment motion had, I think, 90 statements of fact that were not statements. They were paragraphs. My response brief had 147 not statements, paragraphs. This is a very factually intensive case. The district court determined all facts to be, all material facts to be uncontroverted. And that matters in this case for a variety of reasons and on a variety of levels. First of all, the first issue that we have, legal issue, is whether or not there's probable cause to arrest Ms. Hawns as this situation unfolded at her home. The district court determined that no reasonable juror could find that the deputies in question lacked probable cause to arrest Ms. Hawns. Now the reason why that matters and why it matters that the judge made that ultimate finding is because the deputies themselves couldn't agree. When probable cause arose, what constituted probable cause, what actions of Ms. Hawns were probable cause to support a finding of a domestic disturbance? I'm sorry, domestic battery. For example, if we look at the appendix, page 514, there's a series of questions posed to Deputy, or I'm sorry, Corporal Badel, who is one of the arresting officers. I specifically asked him, if Ms. Hawns pushed her husband to get him away from her tire so that she could try to leave the home, is that probable cause to establish a domestic battery? And his response was, it depends. So I ask him a second question. Well, what matters? What matters about that contact? And he says, the violence of the push. So then I push him further, and I ask him additional questions. Okay, so the level of violence of the push is the determining fact. He then automatically recants on himself and says, no, no, no, any physical contact, any physical contact is a domestic battery in this case, and I had probable cause to arrest her. Then I ask him, well, why didn't you? She admits, and you can read the facts, she admits, I pushed him off the tire. They don't arrest her. They don't arrest her. Now, Deputy Dobler, the other deputy in the case, says, that push, that's not probable cause. That's not probable cause at all. She's getting him off a tire. She's trying to leave the house. She's trying to get out of this bad situation. He said he would have done the same.  He tells the husband he would have done the same. So what constituted probable cause to both deputies was Ms. Hahn's gestures, a deaf woman in the dark, upset, in the driveway, reenacting something. They interpret those gestures, and they say, aha, now she's admitted to a crime. Did the husband say anything? No, at that time, the husband was inside. What did he tell the officers? When he, when the officers arrived at the scene, he said, she pushed me in the mud, and she stomped on my hand, and- Is that battery? Well, if there was an intent to harm, it's arguable. It's an arguable question, if that's a battery. The officers at the scene said no. At probable cause level? The officers at the scene, when they investigated that allegation further, determined it was not probable cause. They then later recanted on their own decision, based on her gestures. Couldn't they have probable cause and continue to investigate? They, if they had arrested Ms. Hahn's and done further investigative activities, it'd be a very different legal question we're posed with. In this- What is the definition of battery under the state law? It's to come into contact with someone in your home in a rude or insulting manner. So- So that's, that's a prima facie case right there, right? So if that- You have those facts. If those are the facts, that's a prima facie case. Now, why on earth would the deputies who know that that's the case, then agree to let her leave after she's already admitted she's pushed him? Maybe they thought, gee, they're overcome by sympathy for a handicapped person. And they don't always arrest every person of every crime they see. They don't always arrest. And, in fact, their decision was, this situation has been de-escalated. She got her car keys. He's got his car keys. Everybody's on their way. Let's go. This is fine. And they decide to let everyone leave. It's only at the point in time when Corporal Badel confronts Ms. Hahn on her porch and says, do you know how close I was to arresting you? And he gets her upset and she starts reenacting something. She has her suitcase in her hand and she's heading to her cousin's house. That's correct. That's correct. And the Deputy Dobler himself says, I was satisfied. I was fine. Everyone was going to go their separate ways. The next controverted issue of fact that the court just sort of glosses over, doesn't even really address, is this idea that there was a kick and a stomp and a push, that there was these three separate actions conducted by the plaintiff. Now, there's complete controversy or controverted facts in the record here. First of all, the plaintiff, her testimony itself is, I never kicked him. I never stomped on him. And then she comes back later and at page 460 of the appendix she says, in fact, physically I couldn't have stomped on him because I was behind him and he was on all fours. So I couldn't even have reached my foot over to have stomped on his hand. It just wasn't possible. So she clearly testifies, there's no kick, there is no stomp. And she also testifies, I didn't tell the deputies that I kicked or stomped him. I never made that admission. What do the deputies testify to? They testify, Deputy Dobler testifies that without a doubt, Ms. Hans demonstrated an intentional stomp. He says that at page 482 of the appendix. Now, he is interpreting a deaf person's motions and that right there, that interpretation, kind of adds this layer of what are we really talking about here? Does he contend that that was something that is not seen on the video? In other words, does he say that what's on the video shows the stomp? Well, that's what's really interesting, isn't it? Is the video, they watched the video in their depositions. Deputy Dobler states, oh, yeah, right there, that shows that at this moment in time, I can see where she's reenacting a stomp. I show that exact clip to Deputy, or to Corporal Badel and he says, no, that doesn't show a stomp. How is that not a controverted issue of fact? If they are watching the same video and seeing different things, they are at the same incident and have different memories. Do we look at and consider their subjective views or do we look at objective facts that could support probable cause? I think when you are doing a probable cause analysis, it is critical that you study what the officers studied and what the officers did. In the district court opinion, the district court notes, well, we have the ability to look at the totality of the circumstances to evaluate whether they had probable cause. That is true if the officers are relying on the totality of the circumstances. The officers study this case for 20, 25 minutes, interview the parties, albeit not well, but they interview the parties, they don't take witness statements, they do all this different stuff and they ultimately decide she can go. The only reason they arrested her was her gestures after she was confronted on the porch. The most important issue of fact. That's not the only reason. I think it cuts in your favor. The dog biscuit comes into play too. What we have is the deputy, the corporal, who says, that's it, she's under arrest. He's apparently not feeling well and wants to wrap this thing up. I can see where he's getting frustrated. He's the one who says, you came this close to being arrested, which leads to all of the kicking motions and that. But when he says, oh, that's it, she's getting arrested, it's because he disbelieves her about the dog biscuit for some reason. Is that right or do you disagree with that? That's what I got off of the video. Well, that is what I got off the video from his deposition. He says, oh, no, no, she admitted to further and additional actions. Two things. So he's kind of a hard one to pin down. But if he builds his probable cause on both of those things at the time, as shown on the videotape, isn't he stuck with both of those? I think he's stuck with his affidavit. His affidavit that he turns in to the magistrate judge says that she admitted to kicking her husband, a fact that she denies. He says that she admitted to stomping on her husband, a fact that he later controverts himself in his own deposition. He says, no, she never told me she stomped on him. And this comes back to your original point, which is if this weren't a deaf person, the person would have said, I put my foot on him because he's bigger than I am, stronger than I am, and pushed him so he would not let all the air out of my tire. When an interpreter was present at her deposition, it was very plain what she believes she did that night. And with the help and the auxiliary aid of an ASL interpreter, a few questions in, we're able to understand what happened. The final controverted fact that I really think this court has to focus on is the district court's decision glosses over a whole lot of controverted evidence on the issue of effective communication. Effective communication is stated in the district court opinion that there was no problems with communication between the defendant's representatives and the plaintiff. We have so many examples. For example, when showed the video of the interaction from the body cam, the deputies themselves couldn't understand her on the video. They couldn't understand her at the time either because you can hear them saying, huh, what? They're saying that to the plaintiff as it's happening. And then as they go back and rewatch the video, they're saying, I don't know what she's talking about. That's at the appendix 521, 522, 497, 498. We have the deposition testimony of the jailer, Anderson, who states that plaintiff could read lips. Plaintiff's own deposition testimony is, I can't read lips, maybe two or three words at a time. We have an expert report that says, I tested this woman. She can't really read lips professionally. Do you want to address the second issue involving intentional discrimination? Well, I think it's important in this case that we look at where we are in this circuit. The Tenth Circuit in 1997 decided the Tyler case. In the Tyler case, there's this extensive dissent. The dissent basically says, no, no, no, that's not where we're at as a district. Two years later, we have a case called Davel v. Webb in the Tenth Circuit. It's 194F3D1116. That case addresses Tyler and ultimately rejects it, says it's unsettled law. But regardless of whether or not the law is settled, there is an extensive factual record here showing ineffective communication. Again, we put a hearing person, an able-bodied person in the jail, and we ask them those same questions. We get different questionnaire answers. We get different responses to the suicide screening. That is absolutely present in this case. If you're going to follow Rule 56 and you're going to grant de novo review, I think it's really important that you study the record to see that there was never effective communication in this case and that that matters. Shawnee County can't just get off with saying, well, she didn't ask for an interpreter. Well, you know, she's pretty proficient in reading lips. That's not the burden under the ADA. The burden under the ADA is they have an affirmative duty to try to accommodate disabled people. Did you plead intentional discrimination? I believe through the numerous facts alleged in the pretrial order, I believe that is preserved sufficiently to meet the requirements under the Tenth Circuit, and I'd like to reserve my remaining time. But a pretrial order hopefully would identify issues. Did you identify it as an issue, whether or not there was intentional discrimination? I don't believe that's identified specifically as an issue for determination. I think that's something that could be easily put into the jury instructions, Your Honor. What into what? Into jury instructions. Right, but you start with the pretrial before you get to instructions. Yeah. Okay. I'd like to reserve 50 seconds. May it please the Court. Ashley Begert, appearing on behalf of the Board of County Commissioners of Shawnee County, Kansas, and Sheriff Herman Jones in his official capacity, along with me also is Jonathan Brezon. I'd like to address... Before you get into it, let me just ask you to address the same point that your opposing counsel addressed at the start that she did, which is if this had not been a deaf woman, she never would have been arrested. And the defendants wholeheartedly disagree with that statement. This plaintiff was not arrested because she was deaf. She was arrested because she supposedly kicked her husband. And so she was unable to explain to the officers that she was getting away from the tire and rested her foot on him to push him. She did explain to the officers, and the officers understood that she was pushing him away from the vehicle because he was attempting to let the air out of the tires. The officers understood that. They knew that. And said, I would have done the same. Officer Dobler did say that, yes. But the standard, as Judge Briscoe, I believe, was alluding to is an objective one. It's not a subjective standard. A reasonable officer looking at these facts. A reasonable officer looking at these facts would see that the plaintiff pushed her husband to get him away from the car tire. A reasonable officer would see that on three separate occasions within the video, she unquestioningly acted out a kicking motion. A reasonable officer would see that the victim had injuries, injuries that he claimed stemmed from her actions. How would she reenact lifting her foot and pushing him that would distinguish it from a kicking motion? And keep in mind that she's deaf. I think regardless of whether she kicked or pushed him with her foot, that distinction is a distinction without a difference because it's physical contact. All that's required is physical contact in a rude, insulting, or angry manner. And there's no question under these facts that that occurred. Okay, that's one statute. And I'd like to just ask you, and I realize this isn't central in the case by any focus, but there is a stand-my-ground law in Kansas and it says a person who is lawfully in possession of property and everybody agreed that car was primarily hers to use, the truck was primarily his, she was the one who kept the keys to the car, when that's the case, the person is justified in the use of force against another for the purpose of preventing or terminating an unlawful interference with such property. Letting the air out of the tires would seem to be an interference with the property. What's wrong with that? I disagree with that insofar as this property was marital property. Under Kansas law, that vehicle is under the ownership of both parties. He had just as much right to let the air out of those tires as she did to jump in and leave. It was not an unlawful interference. What did he explain about letting the air out of the tires? Why did he do that or why did he claim he did that? He explained he was letting the air out of her tires because he didn't want her to leave. Originally, he indicated that he jumped in the car to move the car and leave and she indicated in her deposition that she didn't want him to do that, so she jumped into the car to call 911. It was after that that he got out of the vehicle. But why didn't he want her to leave? I reviewed the judge's ruling, I mean, extensive opinion here, and I couldn't tell as to whether... It seemed like the police thought he was justified in letting the air out of the tires, but I found nothing by way of explanation as to why that would have been justified. The only explanation in the record that he gave is when he was on the phone with dispatch and he indicated that he didn't want her to leave because he wanted to talk about it. They'd been having an argument. She had left earlier in the night during their argument and then she came back to the residence after their first conversation. Yes, but she had the right to leave. She did have the right to leave. She had the right to take the keys to his truck and leave. That's correct. So if spouses get into an argument and they both have the right to leave and diffuse the situation, but if one lets the air out of the tires so that the other one can't leave without some kind of legal justification, you would think that the judge, looking at the summary judgment, would explain why that would be appropriate conduct. And I couldn't find that in the ruling. Well, under Kansas law, you don't have the authority. What is unquestionable is that you don't... Okay, so under Kansas law, a husband has the right to let the air out of his wife's tires if he doesn't want the wife to, quote, leave? There's nothing in Kansas law that... What case in Kansas says that? Well, there's nothing that indicates that he doesn't have the right to let the air out of a vehicle that he owns. There is a case... Oh, I see. They don't own the car. He owns the car. They both own it jointly. It's joint marital property. They purchased it together during the course of their marriage. Right. Well, they own other property, too. And let's say it's a family album of photos, and there's only one copy, and it's just precious to her, and he says, I'm going to light this thing on fire, and pulls out his matches and gasoline, and she pushes him. You're saying that, no defense, that's a battery? I'm saying, yes, that she does not have the authority. What the state law says is that you don't have the authority during a verbal argument to engage in physical contact. There's no authority to do that. And is letting the air out of tires constructively physical contact? Not against the plaintiff. There's no physical contact against the plaintiff. What would have stopped the plaintiff from walking off the property? So if you have a way of imprisoning your wife, that's okay, but the wife doesn't have the right to take any steps to escape. Because that would be battery. She could have taken multiple other steps to escape. There's no evidence in the record that indicates she couldn't have walked off the property and called her cousin. She called her cousin while she was there with the officers. There's no indication that he was holding her down, imprisoning her on the property. They'd had a verbal argument, and he was letting the air out of the tires of the car that he owned. Well, there's two explanations. One is, he stomped me, and then the husband says, no, she didn't stomp me. Once he thought about it a little bit, he said, no. So which is the one the officer should accept? She did or she didn't? I don't necessarily think that in this particular case it matters. I think that there's no question that with pushing him that she made physical contact with him in a rude, insulting, or angry manner, regardless of whether she stomped him or not. It's worth noting that she told her expert in this case that she did step on his hands, and what she said in her deposition was that she didn't. She told her expert a different story. But the word is stomp, and that's the word that the husband first used, and then he later said, as she pushed me, she came over the top and stepped on my hand. And he had physical injuries to his hand. Yeah, but it wasn't like she took a tire iron to his hand. It's part of the shoving motion. It's the way that it was ultimately left with the officers before they decided to arrest. That's the only thing they had in front of them, both parties. They had the push, they had kicking motions, and they had what he indicated was a stomp. How does the dog biscuit fit into this? Is that part of the probable cause? No, I don't think that has anything to do with probable cause. Well, he certainly said on the video when he went in and asked the husband about this dog biscuit being thrown and hitting his wife, he said, did this happen? And the husband, oh, no, no, a dog biscuit, what? And then it turns out, guess what? There's a dog biscuit in the driveway. And then the officer says, and the beauty is, we don't have to argue about anything because it's right on the video. The officer says, well, that's it, she's under arrest. And there are two reasons. She changed her story, and he's not buying this dog biscuit thing, which there's no reason in the world to believe the dog biscuit didn't happen. So does that infect the probable cause determination? Why not? I think, first of all, it's important to note that Deputy Badle, the one who went in and spoke to Mr. Hans about the dog biscuit, was not the one who made the decision to arrest the plaintiff. And you can tell during the deposition testimony that Deputy Dobler was the one who made the decision to arrest her. And he indicated that after she acted out what had happened, he looked up at Corporal Badle and indicated, well, now she's going to jail. Who had the camera on? Deputy Badle. And he's the one who went in the house and was talking about the biscuit. And then he says to the husband, who doesn't want this to happen, he says, well, then she's going to jail, or she's under arrest or something. So I don't know what you're talking about. He's the one who said she's going to be arrested. The purpose of investigating the dog biscuit didn't have anything to do with whether or not there was probable cause to arrest this plaintiff. It had to do with whether or not there could potentially be probable cause to arrest Mr. Hans. I guess we'll both look at the video. And the deposition testimony by Deputy Dobler, who indicated that he was the one who made the decision. You can't hear it in the video, but he's the one who made the decision. In addition to all of this, we can talk about the officer's conduct all day long and what they did or didn't do. A, it's an objective standard. And B, the defendants in this case is a municipality. So regardless of whether or not there is or is not probable cause, the analysis does not stop there. You still have to find that there is a policy or custom on behalf of the municipality that is the driving force behind the arrest. There's been nothing that the plaintiff has pointed to, no policy, no custom at all in this case, indicating that defendants can be liable for that reason. So please don't end your analysis at the probable cause. It goes much further than that. I'd also like to address the intentional discrimination and the requirement here in order to get compensatory damages. Today is the first time that I've heard plaintiff indicate that she has in any way pled intentional discrimination in this case. It's not in the pretrial order. In response to defendant's motion for summary judgment, the plaintiff didn't plead intentional discrimination. And no intentional discrimination can be inferred from the facts in this case. There's overwhelming support for why intentional discrimination should be required for compensatory damages. This circuit interprets ADA claims by borrowing language from Section 504 of the Rehabilitation Act. And the Rehabilitation Act has held that intentional discrimination is required for compensatory damages. Both the Rehabilitation Act and the ADA borrow remedies from Title VI, and Title VI requires that intentional discrimination be required for compensatory damages. At least four other circuits have ruled this way. As the District Court correctly noted, the Supreme Court has had the opportunity to redirect this holding, and they have declined to do so. And plaintiffs in ADA cases aren't left without a remedy just because they have to show intentional discrimination to get compensatory damages. They can still get an injunction, declaratory relief, attorney's fees, or they can plead the facts necessary to show intent on behalf of the defendants. The plaintiff has simply waived this by not including it in the pretrial order. Tyler says so. But even if you show that she didn't waive it, none of it can be inferred. Again, she has failed to point to any policy that would create a likelihood that pursuit of such policy would result in a violation of federally protected rights. There's no facts capable of supporting an assertion that she was denied the ability to communicate with the officers. She was provided written materials. She communicated with her husband of 18 years through written materials. He didn't even know sign language. He was learning to sign in accordance with her testimony. There's nothing about the interaction that occurred at the jail that would have changed here had, excuse me, the outcome wouldn't have changed here had there been any other additional form of communication or auxiliary aid. The plaintiff, there's no question, she was on medication for depression, had been for years. In fact, she'd been hospitalized within the last year for depression. She wrote down where she'd been hospitalized. She wrote down her medication list. But a significant factor was her response to the question, are you feeling hopeless? And she indicated somehow, that one I don't have a video of, but what she says is I was showing I'm exasperated by this whole condition. I was headed to my cousins, basically, and now here I am, subject to all of this. And so that's an area, if she could have explained, no, I don't feel hopeless, I just feel like what in the world is happening to me right now, that would make a difference. And the ability to explain that through written note was provided to her. She had the ability to write it down right there. She had just written down her medication list. She had written down that she had been hospitalized in Vallejo. A person who is asked the question, are you feeling helpless or hopeless, disabled or not, could shrug their shoulders in response to that question. It's certainly not a negative response. She's not saying no by shrugging her shoulders. And out of an abundance of caution and an effort to protect this plaintiff from doing something harmful to herself, defendants placed her on suicide watch, and regardless of her answer to the hopeless and helpless question, still had plenty of authority to do so, to protect her. So she went from, I'm heading to my cousin's house, I've got my luggage and I'm on the front step to a strip search, and everything's okay. That's correct. As the case developed and as the interaction continued, it became clear there was probable cause. It became clear that once she got to the jail, she had to be placed on suicide watch for her own protection. If she hadn't been and something would have happened, we'd be her on a different case. If there are no further questions, I'll conclude my argument. Thank you. Thank you. Very briefly, Judge Lucero, why did he not want her to leave? No one knows but him. He was drunk.  She called 911 because she wanted to get out of there. The record certainly doesn't provide as much guidance on that. I think it's really critical that we look at the full record before this court when we evaluate whether or not Ms. Hans had effective communication with her jailers. What about the point, and that seems like a good one, you didn't sue the officers, you sued the county. So where's your practice and policy? Well, I think that if you look at the qualified immunity analysis in the Cortez case, that gives you what you need to get to the point of we have a 1983 claim against Shawnee County and Sheriff Jones for a wrongful arrest. We have a Kansas State claim for a wrongful arrest. And now I'm over my time. Sorry, Judge. You want to go ahead and respond, finish your statement? Sure. Just briefly, in this case it is very clear that Shawnee County policy required an arrest if there was probable cause for a domestic battery. They ultimately determined there was no domestic battery and allowed the plaintiff to get her suitcase to leave. Then they violate their own policy, essentially, by saying, oh, no, no, that prior conduct we saw is now a sufficient basis. So it seems as though the policy itself was being violated by their own officers. So thank you, Your Honor. Thank you. Thank you both for your arguments this morning. The case is submitted. Court is in recess until 2 o'clock this afternoon.